**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| RONALD ALEXANDER GARCIA DELGADO, | **Civil Action No**. |
| Plaintiff, | |
| v. | **COMPLAINT AND JURY TRIAL DEMAND** |
| EXPERIAN INFORMATION SOLUTIONS, INC., | |
| Defendant. | |

## COMPLAINT

Ronald Alexander Garcia Delgado ("Plaintiff") brings this action on an individual basis, against Experian Information Solutions, Inc. ("Defendant" or "Defendant Experian") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq*.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse.  Individual consumers can and do sustain substantial damage,

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      Defendant Experian Information Solutions, Inc., together with non-parties Equifax Information Services LLC ("Equifax"), and, Trans Union LLC ("Trans Union"), are the three major credit reporting bureaus in the United States.

5.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies."  *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

8.      Congress made the following findings when it enacted the FCRA in 1970:

(a)      The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

9.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

10.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

11.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

12.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

13.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

14.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about a consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

15.     Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

16.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

17.     Ronald Alexander Garcia Delgado ("Plaintiff") is a natural person residing in Lewisville, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.     Defendant Experian Information Solutions, Inc. ("Experian" or "Defendant") is a corporation with a principal place of business located at 701 Experian Pkwy., Allen, Texas 75013, and is authorized to do business in the State of Texas, including within this District.

19.     Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f) and is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS
### Summary of the Fair Credit Reporting Act

22.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

23.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

24.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

25.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

26.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## The "Mixed File" Problem

27.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

28.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

29.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

30.     "Mixed files" create a false description and representation of a consumer's credit history and result in the consumer not obtaining credit or other benefits of our economy.

31.     Defendant's procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another.

32.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other. This violates the consumer's privacy and also greatly increases their risk of identity theft.

**The "Mixed File" Problem is Known to Defendant**

33.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files.

34.     In particular, Defendant has been on notice of the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

35.     Defendant mixes files even though every consumer has unique personal identifying information, such as a Social Security number.  That is so because its systems allow information to be included in a consumer's file even when the Social Security number reported with the information is different from the Social Security number on the consumer's file.

36.     Defendant knows that its matching procedures are causing inaccurate consumer reports, consumer disclosures, and mixed files.

37.     In the 1990's, the Federal Trade Commission ("FTC") sued Defendant's predecessor TRW (together with non-parties Equifax and Trans Union) because of its failure to comply with the FCRA including the mixing of consumers' files.

38.     In the 1990's, the Attorneys General of numerous states sued Defendant's predecessor TRW (together with non-parties Equifax and Trans Union) because of its failure to comply with the FCRA including the mixing of consumers' files.

39.     In 1991, TRW signed a Consent Order with the FTC.  To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and social security number.

40.     In 1992, non-party Trans Union signed a Consent Order with the Attorneys General of 17 states.  Non-Party Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

41.     In 1992, non-party Equifax signed an Agreement of Assurances with the State Attorneys General and agreed to take specific steps to prevent the occurrence of mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes resulting from mixed files.

42.     In 1995, non-party Equifax signed a Consent Order with the FTC.  Non-party Equifax agreed it would follow reasonable procedures to assure the maximum possible accuracy of the information on a consumer's file including, but not limited to, procedures to detect logical errors prior to reporting information on a consumer's file, procedures to prevent mixing as a result of data entry by third parties when the third party requests a consumer's report, and procedures during a reinvestigation specifically designed to resolve consumer disputes related to a mixed file.

43.     To prevent the occurrence of a mixed file, Defendant together with non-parties Equifax and Trans Union entered into agreements not to place information in a consumer's file (other than certain public record information) unless it has identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security number; (iii) the Consumer's date of birth, or (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer.

44.     Defendant and non-parties Equifax and Trans Union continue to repeatedly mix consumers' files despite agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

45.     When those lawsuits have gone to trial, juries have found that Defendant and non-parties Equifax and Trans Union, willfully violated the accuracy and reinvestigation requirements of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million. Yet the "mixed file" problem continues.

46.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant and non-parties Equifax and Trans Union over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC*.

47.     Non-party Equifax's matching logic mixed two consumers' files when only seven out of the nine digits of the two consumers' Social Security numbers matched.  *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006).

48.     In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.  Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

---

[1] *A.G. Schneiderman Announces Groundbreaking Consumer Protection Settlement With The Three National Credit Reporting Agencies*, Office of the N.Y. State Att'y Gen., (Mar. 9, 2015) https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three  (last visited Apr. 19, 2024).

49.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.  Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

50.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

51.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom.  Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

52.     Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA.

53.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

54.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).  Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

55.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

56.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies to review their procedures when a mixed file occurs.

57.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

58.     Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in consumer reports about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of a distinct consumer.

**Plaintiff Applies for Furniture Financing**

59.     Plaintiff immigrated to the United States in February 2023.

60.     In or around October 2023, Plaintiff and his wife moved into a rental home with a monthly rent of $2,700.00.

61.     Although the rent was quite high, Plaintiff signed the lease because he anticipated he would only live there temporarily.

62.     Shortly thereafter, Plaintiff began searching for furniture in order to furnish his new home. However, Plaintiff needed to secure financing in order to do so.

63.     Accordingly, Plaintiff submitted various applications for financing.

64.     Unfortunately, Plaintiff's credit applications were repeatedly denied, and he was unable to get the financing he needed to purchase the furniture.

65.     At the time, Plaintiff did not know why he was denied.

66.     Upon information and belief, one or more of Plaintiff's credit applications were denied because Defendant reported inaccurate information about Plaintiff.

67.     Upon information and belief, Defendant inaccurately published in one or more consumer reports several pieces of information that did not belong to Plaintiff.

68.     Upon information and belief, Defendant inaccurately published in one or more consumer reports several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Ronald Alexander Garcia Diaz ("Diaz").

**Plaintiff Applies for Furniture Financing With Conn's Appliances**

69.     On or about October 25, 2023, Plaintiff completed and submitted a credit application with Conn's Appliances.

70.     For Conn's Appliances to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s). Plaintiff provided Conn's Appliances with his personal identification information and authorized it to obtain copies of his credit files.

71.     On or about October 25, 2023, Conn's Appliances ordered a consumer report on Plaintiff from Defendant.

72.     On or about October 25, 2023, Defendant published and sold a consumer report about Plaintiff to Conn's Appliances in response to Plaintiff's credit application.

**Conn's Appliances Denies Plaintiff's Credit Application**

73.      On or about October 25, 2023, Conn's Appliances received and reviewed Defendant's consumer report about Plaintiff.

74.     Upon information and belief, on or about October 25, 2023, Conn's Appliances denied Plaintiff's credit application in reliance on information contained in the Defendant's consumer report about Plaintiff.

75.     Plaintiff was shocked and confused; he had no reason to think that he would be denied credit with Conn's Appliances.

76.     Upon information and belief, Defendant inaccurately published in the consumer report to Conn's Appliances several pieces of information that did not belong to Plaintiff.

77.     Upon information and belief, Defendant inaccurately published in the consumer report to Chase several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Diaz.

78.     Defendant mixed Plaintiff's consumer file with that of his son, Diaz.

79.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies for a Chase Credit Card**

80.     On or about December 4, 2023, Plaintiff completed and submitted a credit application for a Chase credit card in an effort to build his credit rating.

81.     For Chase to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s). Plaintiff provided Chase with his personal identification information and authorized it to obtain copies of his credit files.

82.     On or about December 4, 2023, Chase ordered a consumer report on Plaintiff from Defendant.

83.     On or about December 4, 2023, Defendant published and sold a consumer report about Plaintiff to Chase in response to Plaintiff's credit application.

**Chase Denies Plaintiff's Credit Application**

84.      On or about December 4, 2023, Chase received and reviewed Defendant's consumer report about Plaintiff.

85.     On or about December 4, 2023, Chase denied Plaintiff's credit application in reliance on information contained in the Defendant's consumer report about Plaintiff.

86.     Plaintiff was shocked and confused; he had no reason to think that he would be denied credit with Chase.

87.     Upon information and belief, Defendant inaccurately published in the consumer report to Chase several pieces of information that did not belong to Plaintiff.

88.     Upon information and belief, Defendant inaccurately published in the consumer report to Chase several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Diaz.

89.     Defendant mixed Plaintiff's consumer file with that of his son, Diaz.

90.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies For a Mortgage Pre-Approval**

91.     In or around January 2024, Plaintiff began working with a program for first time home buyers so that he could secure a pre-approval for a mortgage.

92.     For the program to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s). Plaintiff provided it with his personal identification information and authorized it to obtain copies of his credit files.

93.     Upon information and belief, in or around January 2024, Defendant sold a consumer report about Plaintiff in response to Plaintiff's mortgage pre-approval application.

**Plaintiff is Denied his Mortgage Pre-Approval Application**

94.      Upon information and belief, in or around January 2024, the mortgage pre-approval program received and reviewed Defendant's consumer report about Plaintiff.

95.     In or around January 2024, Plaintiff was informed that the program was unable to proceed with his mortgage pre-approval application.

96.     Upon information and belief, the program's statement was made in reliance on information contained in the Defendant's consumer report about Plaintiff.

97.     Specifically, Plaintiff was informed that he had several derogatory Bank of America accounts.

98.     Plaintiff was confused and worried as he knew he was completely up to date with all of his payments and was in good standing with Bank of America. Further, Plaintiff only had *one* Bank of America credit card.

99.     Upon information and belief, Defendant inaccurately published in the consumer report to the program several pieces of information that did not belong to Plaintiff.

100.     Upon information and belief, Defendant inaccurately published in the consumer report to the mortgage pre-approval program several pieces of information, including personal identifiers and credit accounts which belonged to Plaintiff's son, Diaz.

101.     Defendant mixed Plaintiff's consumer file with that of his son, Diaz.

102.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies For a Capital One Credit Card**

103.     In or around February 2024, believing the issue was a fluke as Plaintiff only has one Bank of America account, Plaintiff decided to apply for a Capital One credit card.

104.     On or about February 26, 2024, Plaintiff completed and submitted a credit application for a Capital One credit card.

105.     For Capital One to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s). Plaintiff provided Capital One with his personal identification information and authorized it to obtain copies of his credit files.

106.     On or about February 26, 2024, Capital One ordered a consumer report on Plaintiff from Defendant.

107.     On or about February 26, 2024, Defendant published and sold a consumer report about Plaintiff to Capital One in response to Plaintiff's credit application.

**Capital One Denies Plaintiff's Credit Application**

108.    On or about February 26, 2024, Capital One received and reviewed Defendant's consumer report about Plaintiff.

109.    Upon information and belief, in or around March 2024, Capital One denied Plaintiff's credit application in reliance on information contained in the Defendant's consumer report about Plaintiff.

110.    Plaintiff was shocked and confused.

111.    At the time, Plaintiff did not know the reason for the denial.

112.    Upon information and belief, Defendant inaccurately published in the consumer report to Capital One several pieces of information that did not belong to Plaintiff.

113.    Upon information and belief, Defendant inaccurately published in the consumer report to Capital One several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Ronald Alexander Garcia Diaz ("Diaz").

114.    Defendant mixed Plaintiff's consumer file with that of his son, Diaz.

115.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies For Credit with Fiesta Furniture**

116.    While Plaintiff's application with Capital One was pending, Plaintiff also decided to try applying for furniture financing again.

117.    Accordingly, on or about March 11, 2024, Plaintiff completed and submitted a credit card application with Fiesta Furniture.

118.    For Fiesta Furniture to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s). Plaintiff provided Fiesta Furniture with his personal identification

information, including his Social Security number, and authorized it to obtain copies of his credit files.

119.   Upon information and belief, on or about March 11, 2024, Fiesta Furniture ordered a consumer report on Plaintiff from Defendant.

120.   Upon information and belief, on or about March 11, 2024, Defendant published a consumer report to Fiesta Furniture in response to Plaintiff's credit application.

**Fiesta Furniture Denies Plaintiff's Application**

121.   Upon information and belief, that same day, March 11, 2024, Fiesta Furniture received and reviewed Defendant's consumer report about Plaintiff.

122.   Shortly thereafter, on March 11, 2024, Fiesta Furniture denied Plaintiff's credit application while Plaintiff was in-person at the store.

123.   At the time, Plaintiff did not know the reason for the denial.

124.   Upon information and belief, Fiesta Furniture denied Plaintiff's credit application in reliance on information contained in Defendant's consumer report about Plaintiff.

125.   Upon information and belief, Defendant inaccurately published in the consumer report to Fiesta Furniture several pieces of information that did not belong to Plaintiff.

126.   Upon information and belief, Defendant inaccurately published in the consumer report to Fiesta Furniture several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Diaz.

127.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies for Credit Through Affirm**

128.    On or about March 12, 2024, Plaintiff completed and submitted a credit application for the purchase of furniture through Affirm (issued by Celtic Bank).

129.    At this point, Plaintiff was desperate to secure furniture for his home.

130.    For Affirm to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s).  Plaintiff provided Affirm with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

131.    Upon information and belief, Defendant sold a credit report about Plaintiff to Affirm in response to Plaintiff's loan application.

**Affirm Denies Plaintiff's Loan Application**

132.    Upon information and belief, on March 12, 2024, Affirm received and reviewed Experian's consumer report about Plaintiff.

133.    On March 12, 2024, Plaintiff learned that Affirm was denying his credit application.

134.    At the time, Plaintiff did not know the reason for the denial.

135.    Upon information and belief, Affirm denied Plaintiff's credit application in reliance on information contained in the Experian consumer report about Plaintiff.

136.    Upon information and belief, Defendant inaccurately published in the consumer report to Affirm several pieces of information that did not belong to Plaintiff.

137.    Upon information and belief, Defendant inaccurately published in the consumer report to Affirm several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Diaz.

138.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Submits a Rental Application With The Mill Old Town**

139.    In or around Spring 2024, Plaintiff completed and submitted a rental application with The Mill Old Town ("The Mill").

140.    For The Mill to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit file(s).  Plaintiff provided The Mill with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

141.    Upon information and belief, Defendant sold a credit report about Plaintiff to The Mill in response to Plaintiff's rental application.

**The Mill Old Town Approves Plaintiff's Rental Application**

142.    Upon information and belief, in or around spring 2024, The Mill received and reviewed Experian's consumer report about Plaintiff.

143.    Upon information and belief, The Mill informed Plaintiff that in order to be approved, he would have to pay a $3,000 non-refundable deposit in addition to first and last month's rent.

144.    Upon information and belief, The Mill required a higher deposit from Plaintiff in reliance on information contained in the Experian consumer report about Plaintiff.

145.    Upon information and belief, Defendant inaccurately published in the consumer report to The Mill several pieces of information that did not belong to Plaintiff.

146.    Upon information and belief, Defendant inaccurately published in the consumer report to The Mill several pieces of information, including personal identifiers and credit accounts, which belonged to Plaintiff's son, Diaz.

147.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's Mixed Credit File**

148.    Shocked, worried, and confused, Plaintiff requested a copy of his consumer report from Defendant.

149.    In or around mid-May 2024, Plaintiff received a copy of his Experian consumer report.

150.    Upon reviewing the contents of his Experian consumer report, Plaintiff was shocked at the appearance of several pieces of information that did not belong to Plaintiff at all.

151.    Specifically, Defendant was reporting the following accounts which did not belong to Plaintiff:

>    (a)    Bank of America
>           Date Opened: September 2018
>           Current Balance: $1,434.00
>           Charged Off
>
>    (b)    Bank of America
>           Date Opened: March 2019
>           Current Balance: 1,736.00
>           Charged Off
>
>    (c)    Bank of America
>           Date Opened: March 2017
>           Current Balance: $0
>
>    (d)    USA Finance Inc.
>           Date Opened: January 2024
>           Current Balance: $ 21, 052.00

152.    The aforementioned accounts belong to Plaintiff's son, Diaz.

153.    Defendant was also reporting the following inquiries that did not belong to Plaintiff but rather belonged to Plaintiff's son Diaz:

>    (e)    700 CREDIT/USA FINANCE INC - Jan 27, 2024;
>
>    (f)    NOWCOM/PABLO MOTORS LLC - Jan 27, 2024

154.    Defendant was reporting the following names which do not belong to Plaintiff, but rather belong to Plaintiff's son Diaz.

(g)    Ronald Alexander Garcia Diaz;

(h)    Ronald AlexanderGarcia Diaz;

(i)    Ronald A Garciadiaz.

155.    Further, Defendant was reporting Plaintiff's year of birth was 1995. This is the year Plaintiff's son, Diaz, was born.

156.    Defendant also reported a former or current employer, "Elite Partners," on Plaintiff's report. This is Diaz's wife's employer.

157.    By reporting the aforementioned credit accounts and other personal information in the credit files presumably about Plaintiff, despite the fact that the accounts and information did not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

158.    As a result of the "mixed file," Defendant made it practically impossible for Plaintiff to obtain credit.

159.    Upon information and belief, in addition to the aforementioned applications, one or more other credit applications submitted by Plaintiff were negatively impacted by the inaccurate information reported by Defendant.

160.    Due to Defendant's inaccurate reporting, Plaintiff was unable to purchase the furniture he needs or acquire a mortgage.

161.    As of the filing of this Complaint, Plaintiff is even without a bed and sleeping on a mattress on the floor.

162.    In addition, upon information and belief, Plaintiff was charged a higher deposit for his new apartment due to Defendant's inaccurate reporting.

163.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

164.    At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

165.    Defendant is aware of the shortcomings of its procedures and intentionally chose not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

166.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

167.    Defendant's conduct has also caused tension between Plaintiff and his wife.

168.    Further, Plaintiff feels as though he cannot support his family.

169.    Defendant's conduct has also caused frustration as Plaintiff is being denied credit he needs due to no fault of his own.

170.    In addition, the inaccurate reporting has caused Plaintiff to fear that he may be wrongfully sued for debts that are not his.

171.    Plaintiff's money was also wasted as he had to pay a higher deposit for his new apartment.

172.    The inaccurate reporting is constantly on Plaintiff's mind. Accordingly, he is often distracted and suffers from sleepless nights.

173.    Due to Defendant's conduct, Plaintiff had refrained from submitting further credit applications despite still needing credit.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

174.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

175.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

176.    On at least one occasion, Defendant Experian prepared patently false consumer reports concerning Plaintiff.

177.    Defendant Experian mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

178.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

179.    As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, physical pain resultant from Defendant's conduct, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

180.    Defendant Experian's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant Experian was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

181.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendant negligently and/or willfully violated the FCRA;

ii.  Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

**DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED on this 11th day of July 2024.

By: */s/ McKenzie Czabaj*
McKenzie Czabaj, AZ Bar No. 036711
**Consumer Attorneys PLC**
8245 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Email: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff*
*Ronald Alexander Garcia Delgado*